Slip Op 17-152

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>REBAR TRADE ACTION COALITION, et al., and HABAS SINAI VE TIBBI GAZLAR ISTIHSAL ENDUSTRISI, A.S.,<br><br>Defendant-Intervenors. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 14-00267 |

**OPINION**

[Final Determination sustained.]

Dated: November 17, 2017

 Matthew M. Nolan, Diana D. Quaia, and Nancy A. Noonan, Arent Fox LLP of Washington, DC for Plaintiff Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S.

 Richard P. Schroeder, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC for Defendant, United States. With him on the briefs were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the briefs was Scott McBride, Assistant Chief Counsel, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

 Alan H. Price, John R. Shane, and Maureen E. Thorson, Wiley Rein LLP of Washington, DC for Defendant-Intervenors Rebar Trade Action Coalition, Nucor Corporation, Gerdau Ameristeel U.S. Inc., Commercial Metals Company, and Byer Steel Corporation.

Gordon, Judge: This action involves the U.S. Department of Commerce ("Commerce") final determination in the countervailing duty ("CVD") investigation of steel concrete reinforcing bar from the Republic of Turkey. See <u>Steel Reinforcing Bar From the Republic of Turkey</u>, 79 Fed. Reg. 54,963 (Dep't of Commerce Sept. 15, 2014) (final affirm. & crit. circum. determ.) ("<u>Final Determination</u>"); <u>see also</u> Issues & Decision Memorandum for the Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination in the Countervailing Duty Investigation of Steel Concrete Reinforcing Bar from the Republic of Turkey, C-489-819 (Dep't of Commerce Sept. 8, 2014), <u>available at</u> http://enforcement.trade.gov/frn/summary/turkey/2014-21989-1.pdf (last visited this date) ("<u>Decision Memorandum</u>"); <u>see also</u> <u>Steel Concrete Reinforcing Bar from the Republic of Turkey</u>, 79 Fed. Reg. 65,926 (Dep't of Commerce Nov. 6, 2014) (final countervailing duty order) ("<u>Order</u>"). Before the court are the motions for judgment on the agency record of Plaintiff Icdas Celik Enerji Tersane ve Ulasim, A.S. ("Icdas") and Defendant-Intervenor Rebar Trade Action Coalition ("RTAC"), and its individual members, Nucor Corporation, Gerdau Ameristeel U.S. Inc., Commercial Metals Company, and Byer Steel Corporation. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012)[1], and 28 U.S.C. § 1581(c) (2012).

This opinion addresses Icdas' challenge to the <u>Final Determination</u>. <u>See</u> Pl.'s R. 56.2 Mot. for J. on the Agency R., ECF No. 52 ("Icdas' Br."); <u>see also</u> Def.'s Resp. in

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, 2012 edition.

Opp'n to Pl.'s R. 56.2 Mots. for J. on the Agency R., ECF No. 69 ("Def.'s Resp."); RTAC's Resp. to Pl.'s R. 56.2 Mot. for J. on the Agency R., ECF No. 70 ("RTAC's Resp."); Pl.'s Reply Br., ECF No. 79 ("Icdas' Reply").

Specifically, Icdas challenges (1) Commerce's selection of benchmark prices used to calculate countervailable benefits that respondents obtained from lignite coal purchases and (2) Commerce's ex parte meeting with petitioners late in the proceeding and acceptance of untimely information. For the reasons set forth below, the court sustains the Final Determination.

**I. Standard of Review**

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620

(1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2017). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2017).

## II. Discussion

### A. Lignite Benchmark

### 1. Rejection of Tier One Steam Coal Price Benchmark Data

Icdas challenges Commerce's determination of the lignite price benchmark on two separate grounds. First, Icdas alleges that Commerce's failure to use the available market-determined prices of steam-coal imports into Turkey as "tier one" data violates the Congressional statutory directive in 19 U.S.C. § 1677(5)(E) as well as Commerce's own express regulatory preference for the use of such tier one data to establish benchmarks as set forth in 19 C.F.R. § 351.511(a)(2). Second, Icdas argues that Commerce's use of the "tier two" GTIS world market lignite pricing data to compute a benchmark "includes prices that are not reasonably available to Icdas, are not commercially realistic, and resulted in a highly distorted margin." Icdas' Br. 26. This section addresses Icdas' first contention regarding Commerce's failure to use tier one steam coal import pricing data, while Section II.A.2, infra, addresses Icdas' challenge to Commerce's use of the tier two GTIS lignite pricing data.

All parties agree that Commerce has established an express three-tiered hierarchy for the determination of market-price benchmarks in evaluating the adequacy of remuneration for alleged subsidy programs. "Under 19 CFR 351.511(a)(2), [Commerce] sets forth the basis for identifying appropriate market-determined benchmarks for measuring the adequacy of remuneration for government provided goods or services. These potential benchmarks are listed in hierarchical order by preference: (1) market prices from actual transactions within the country under investigation (e.g., actual sales, actual imports or competitively run government auctions) (tier one); (2) world market prices that would be available to purchasers in the country under investigation (tier two); or (3) an assessment of whether the government price is consistent with market principles (tier three). As provided in the regulations, the preferred benchmark in the hierarchy is an observed market price from actual transactions within the country under investigation." Decision Memorandum at 14. Accordingly, under this hierarchy, Commerce will first look to see if there is evidence of a "market-determined price for the good or service resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2).

Icdas relies heavily on this express regulatory preference for market-determined pricing, but attempts to discard the clear limitation that such a preference only applies for market-determined pricing relating to the "good" in question. Specifically, Icdas asserts that Commerce was obligated to use the tier one pricing data resulting from actual import transactions of hard steam coal; however, Commerce explained in its decision memorandum that it had found that hard steam coal was not supplied by the Government of Turkey ("GOT"), but instead only lignite coal was provided to Icdas by a Turkish state-

owned entity. For this reason, among others, Commerce determined that it would be inappropriate to use steam coal prices to derive a benchmark for lignite. <u>Decision Memorandum</u> at 14-16.

Icdas argues that all of the parties, at some point during the investigation, assumed that steam coal and lignite coal were interchangeable in their use in power generation and for purposes of Commerce's investigation. Icdas' Br. 20-22. Icdas also highlights that in its preliminary determination, Commerce expressly found lignite and hard steam coal to be interchangeable for purposes of the investigation's analysis. <u>Id.</u> at 22 (citing Commerce's preliminary determination memo at 18). With this background, Icdas asserts that "[n]o information on the record shows that any of these findings changed between the Preliminary Determination and the Final Determination . . . . Commerce provided no support in its apparent conclusion that lignite coal is different than hard steam coal for purposes of power plant consumption." <u>Id.</u> at 22-23.

More specifically, Icdas contends that Commerce relied upon mere "speculation" in determining that steam coal is not interchangeable with lignite coal for purposes of the investigation. <u>Id.</u> at 23. RTAC, in response, notes that Icdas acknowledged in its own questionnaire responses several significant differences between lignite and hard steam coal including the significant differences in caloric values of the types of coal (which in turn affect their pricing), as well as the fact that hard steam coal ashes can be resold to cement producers while lignite coal ash must be disposed of as waste. RTAC's Resp. 15 (citing Icdas' CVD Questionnaire Response at 23-24). In addition, Commerce explained that it was only after its preliminary determination during verification that it became aware

of the essential differences between the types of coal (including the differing physical characteristics and uses of hard steam coal, lignite coal, coking coal, etc.), as well as the fact that Turkish Coal Enterprises ("TKI") "mines only lignite" and that Icdas only purchased lignite domestically, while it imported hard steam coal. Decision Memorandum at 13-14. Commerce also noted that the administrative record indicated significant additional differences between steam coal and lignite, such as the fact that "lignite is mined close to the surface and is less expensive to extract, whereas steam coal is mined deep in the ground," and "generating energy with lignite requires a larger volume of coal than with hard coal, importing lignite requires greater freight and transportation expenses, so imports of lignite (in comparison to hard coal imports) into Turkey are negligible." Def.'s Resp. 38 (citing GOT Verification Report).

Icdas argues that Commerce improperly narrowed the scope of the petition and the investigation without good cause. Icdas' Br. 20-21. Specifically, Icdas argues that it "makes little sense for [Commerce] to exclude 'steam coal' from any potential benchmarks when, in fact, steam coal includes both lignite and hard steam coal." Id. at 21. Here, Icdas misses the very point of Commerce's verification and fact-finding in the course of its investigation. Commerce initially analyzed a broad petition that posited subsidies in the "Steam Coal" market, but upon gaining a better understanding of the factual circumstances during the course of its investigation, Commerce found that only the narrower lignite coal market was at issue because Icdas' only domestic coal purchases were of lignite while it imported hard steam coal. Contrary to Icdas' position, in light of this factual development, it would have made "little sense" for Commerce to continue to

analyze the broader market for "steam coal" when the only potential countervailable subsidies respondents were receiving were specific to lignite coal. Commerce acted reasonably when focusing its investigation to the "Provision of Lignite for LTAR."[2] Decision Memorandum at 14.

Icdas' insistence that Commerce erred by rejecting the pricing data of steam coal imports into Turkey entirely relies upon the assumption that Commerce could not and did not reasonably determine on the record that steam coal and lignite coal were not interchangeable for purposes of the investigation. Commerce, however, with the benefit of further investigation after its preliminary determination, determined that lignite coal and steam coal were not interchangeable and that lignite coal was the "only government-provided good" being provided for LTAR, and reasonably found that steam coal prices from import transactions into Turkey were not appropriate sources for a benchmark for the investigation. Decision Memorandum at 15-16. Notably, Icdas did not dispute that the lignite coal market in Turkey was distorted, implicitly accepting Commerce's determination that domestic lignite prices from actual transactions could not serve as a tier one source of data for calculating a benchmark. See Icdas' Br. 17-25; Def.'s Resp. 40. Accordingly, Commerce reasonably concluded that it would proceed to evaluate tier two pricing data for world market transactions for lignite coal.

On this administrative record the court believes that a reasonable mind could reach Commerce's determination that steam coal is not interchangeable with lignite coal as well

---

[2] "LTAR" stands for less than adequate remuneration.

as its determination that there were no appropriate tier one data sets for evaluating the adequacy of remuneration for transactions in the lignite coal market.

## 2. Use of GTIS Data

On January 22, 2014, RTAC included Global Trade Information Services ("GTIS') pricing data for 2012 exports of lignite from various countries as part of its submission of factual information. See Non-Confidential App. to Pl. Icdas' Br. in Support of its R. 56.2 Mot. for J. on the Agency R. 50-53, 56-68 (RTAC's Submission of Factual Information Jan. 22, 2014), ECF. No. 57 ("Icdas' Br. App."). On July 29, 2014, RTAC submitted its administrative case brief in which it argued that Commerce should depart from its preliminary determination and find that lignite coal is distinguishable from hard steam coal, and that Commerce accordingly should use lignite coal world market prices to calculate the benefit received by Icdas' purchases of lignite coal from TKI. See Icdas' Br. App. 249-260 (Case Brief of the Rebar Trade Commission July 29, 2014). On July 31, 2014, Icdas submitted a rebuttal brief arguing that Commerce properly used imported hard steam coal prices to calculate the lignite benchmark in its preliminary determination. See Icdas' Br. App. 265-271 (Revised Rebuttal Brief of Icdas July 31, 2014). On September 9, 2014, Commerce issued the Final Determination and corresponding Decision Memorandum in which it explained its decision to distinguish lignite coal from hard steam coal and its refusal to use hard steam coal prices in calculating the benchmark for Icdas' benefit from the lignite purchases from TKI. See Decision Memorandum at 13-17. On September 15, 2014, Icdas submitted a ministerial errors allegation to Commerce, in which it attempted to argue that Commerce's selection and reliance upon the GTIS

lignite data was an "unintentional error" due to the GTIS's data's alleged inaccurate and incomplete nature. See Icdas' Br. App. 319-325 (Icdas' Ministerial Errors Allegation Letter Sept. 15, 2014). Commerce rejected Icdas' ministerial errors allegation, explaining that the selection and use of the GTIS data was a deliberate choice, and further noting that "[i]f Icdas had believed that the GTIS data on the record was incomplete, it had the opportunity during the investigation to add additional GTIS information to the record, and did not do so." Icdas' Br. App. 338 (Memorandum from K. Johnson to M. Skinner, re: Allegations of Ministerial Errors in the Final Determination Oct. 1, 2014).

Using arguments substantially similar to those in its ministerial errors allegation, Icdas asserts in its briefing to the court that Commerce's use of the GTIS lignite pricing data set to establish the tier two benchmark was improper, contending that such prices are "not reasonably available to Icdas, are not commercially realistic, and resulted in a highly distorted margin." Icdas' Br. 26. Commerce does not dispute Icdas' arguments on the merits, but instead contends that these arguments have been waived as Icdas failed to properly raise them before the agency during the administrative proceeding, and has thus failed to exhaust its administrative remedies. Def.'s Resp. 44-47.

The court agrees that Icdas failed to exhaust its administrative remedies. See 28 U.S.C. § 2637(d); see also Icdas' Br. App. 265-271; 19 C.F.R. § 351.309(c)(2) (case briefs should contain all relevant arguments); Boomerang Tube LLC v. United States, 856 F.3d 908 (Fed. Cir. 2017); Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

Consol. Court No. 14-00267                                                                                    Page 11

Commerce's use of the GTIS data to determine the lignite benchmark was squarely in play. Specifically, RTAC argued in its administrative case brief that Commerce should use the GTIS lignite data in calculating the lignite benchmark. See Icdas' Br. App. 260 & n.40 (highlighting RTAC's submission of the GTIS lignite data in early 2014). Icdas, in its rebuttal brief, failed to directly address this argument or challenge the GTIS data specifically proposed for use by RTAC. See Icdas' Br. App. 266-272. Icdas had the opportunity to challenge the adequacy of the GTIS data before Commerce but chose not to do so, attempting to correct its omission through ministerial error comments submitted after the final determination. See Icdas' Br. App. 319-325 (providing substantially the same arguments as to the impropriety of using the GTIS lignite data due to its inaccuracy and incompleteness as Icdas has raised before this court). Contrary to Icdas' arguments in its reply brief, Icdas' Reply Br. at 4-5, nothing limited its ability to respond in toto to the usefulness of the GTIS lignite data. And in response to the ministerial error comments, RTAC was quick to point out that Icdas did not challenge the substance of the GTIS data until it was too late. Icdas' Br. App. 329 (RTAC's Response to Icdas' Ministerial Errors Allegation Letter) ("Icdas is trying to argue now what it failed to argue in its case or rebuttal briefs. Icdas could have made an alternative argument on the GTIS data in the event the Department relied on it for the final determination. The information was on the record since Petitioner's January 22, 2014, factual information submission, but Icdas failed to criticize it until after the final determination. Instead of raising this issue at the proper time, Icdas argued that the Department should use another source to value lignite and ignored the validity of the GTIS data altogether."). It is all too clear that Icdas attempted to correct

its omissions by including them in a ministerial errors allegation letter, and again tries to raise those same arguments before the court after failing to properly present them to Commerce.

The facts here are similar to Boomerang Tube LLC v. United States, 856 F.3d 908 (Fed. Cir. 2017), in which the Federal Circuit concluded that it was appropriate to require exhaustion of administrative remedies for interested parties attempting to raise new arguments that that they failed to raise before Commerce in their rebuttal briefs. Like the parties in Boomerang, Icdas here committed a similar omission and failed to raise arguments about Commerce's use of the GTIS data to determine the lignite benchmark that it could and should have raised in its rebuttal brief.

Icdas tries to avoid this result by arguing that it somehow provided skeletal "notice" to Commerce of its arguments. Icdas' Reply 3-5 (citing Trust Chem. Co. v. United States, 35 CIT ___, 791 F. Supp. 2d 1257, 1268 n.27 (2011) ("The determinative question is whether Commerce was put on notice of the issue, not whether Plaintiff's exact wording below is used in the subsequent litigation.")). This misunderstands the requirement of exhaustion of administrative remedies and its twin purposes of protecting administrative authority (by requiring arguments to be presented to the agency in the first instance so that agency may find facts, apply its expertise, and interpret statutes and regulations that it administers) and promoting judicial economy (by avoiding unnecessary remands for agency to address arguments in first instance). Providing mere notice of an argument or issue accomplishes neither purpose; notice is therefore not enough. As for the passing observation in a footnote in Trust Chem. Co. that a "determinative question" for the

exhaustion requirement is whether Commerce was simply "put on notice" of the issue, this is not correct because "mere notice" fails to accomplish the twin purposes of the exhaustion requirement, and therefore simply putting Commerce on notice cannot satisfy the exhaustion requirement. Arguments must be presented in toto for this entire judicial review process to work sensibly.

### B. Ex Parte Meeting

Icdas challenges Commerce's decision to hold an ex parte meeting with RTAC late in the proceeding at which Commerce accepted untimely information (two photographs) provided by RTAC. Icdas' Br. at 32-34. Defendant responds that the procedural waiver for RTAC's photographs did not cause prejudice to Icdas because they did not depict anything material to Commerce's decision, and that Icdas had a full opportunity to convey its views on the meeting and photos, and Icdas did so, before Commerce issued the Final Determination. Def.'s Resp. 50-51. Icdas for its part cites a "heavy burden" to prevail on a claim of procedural unfairness. See Icdas' Br. 34. Problematically for Icdas (and despite the bad optics of an ex parte meeting held so late in the proceeding), Commerce is expressly authorized by statute to hold ex parte meetings. See 19 U.S.C. § 1677f(a)(3). The statute requires Commerce to maintain a record of any ex parte meetings and disclose any information that is submitted during the meeting, 19 U.S.C. § 1677f(a)(3), (4), which Commerce did here. See Icdas' Br. App. 282-86 (Memorandum from M. Skinner to The File, re: Ex Parte Meeting with Members of Domestic Industry and Counsel to Petitioners Aug. 19, 2014). As Icdas has failed to demonstrate that the

untimely photographs factored into the Final Determination, the court sustains Commerce on this issue.

### III. Conclusion

For the foregoing reasons, the court sustains the Final Determination for each of Icdas' issues.

                                                  /s/ Leo M. Gordon
                                                  Judge Leo M. Gordon

Dated:    November 17, 2017
            New York, New York