Slip Op 17-153

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> REBAR TRADE ACTION COALITION, <u>et al.</u>, and HABAS SINAI VE TIBBI GAZLAR ISTIHSAL ENDUSTRISI, A.S., <br><br> Defendant-Intervenors. | Before: Leo M. Gordon, Judge <br><br> Consol. Court No. 14-00267 |

**OPINION**

[Final Determination sustained.]

Dated: November 17, 2017

<u>Matthew M. Nolan</u>, <u>Diana D. Quaia</u>, and <u>Nancy A. Noonan</u>, Arent Fox LLP of Washington, DC for Plaintiff Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S.

<u>Richard P. Schroeder</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC argued for Defendant, United States. With him on the briefs were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director. Of counsel on the briefs was <u>Scott McBride</u>, Assistant Chief Counsel, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

<u>Maureen E. Thorson</u>, Wiley Rein LLP of Washington, DC argued for Defendant-Intervenors Rebar Trade Action Coalition, Nucor Corporation, Gerdau Ameristeel U.S. Inc., Commercial Metals Company, and Byer Steel Corporation. With them on the brief were <u>Alan H. Price</u> and <u>John R. Shane</u>.

Gordon, Judge: This action involves the U.S. Department of Commerce ("Commerce") final determination in the countervailing duty investigation of steel concrete reinforcing bar from the Republic of Turkey. See Steel Reinforcing Bar From the Republic of Turkey, 79 Fed. Reg. 54,963 (Dep't of Commerce Sept. 15, 2014) (final affirm. & crit. circum. determ.) ("Final Determination"); see also Issues & Decision Memorandum for the Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination in the Countervailing Duty Investigation of Steel Concrete Reinforcing Bar from the Republic of Turkey, C-489-819 (Dep't of Commerce Sept. 8, 2014), available at http://enforcement.trade.gov/frn/summary/turkey/2014-21989-1.pdf (last visited this date) ("Decision Memorandum"); see also Steel Concrete Reinforcing Bar from the Republic of Turkey, 79 Fed. Reg. 65,926 (Dep't of Commerce Nov. 6, 2014) (final countervailing duty order) ("Order"). Before the court are the motions for judgment on the agency record of Plaintiff Icdas Celik Enerji Tersane ve Ulasim, A.S. ("Icdas") and Defendant-Intervenor Rebar Trade Action Coalition ("RTAC"), and its individual members, Nucor Corporation, Gerdau Ameristeel U.S. Inc., Commercial Metals Company, and Byer Steel Corporation. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012)[1], and 28 U.S.C. § 1581(c) (2012).

This opinion addresses RTAC's challenge to the Final Determination. See RTAC's R. 56.2 Mot. for J. on the Agency R., ECF No. 50 ("RTAC's Br."); see also Pl.'s Resp. in

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Opp'n to Def.-Intervenor RTAC's R. 56.2 Mot. for J. on the Agency R., ECF No. 68 ("Icdas' Resp."); Def.'s Resp. in Opp'n to Pl.'s R. 56.2 Mots. for J. on the Agency R., ECF No. 69 ("Def.'s Resp."); RTAC's Reply Br., ECF No. 80 ("RTAC's Reply").

Specifically, RTAC challenges (1) Commerce's selection of benchmark prices used to calculate countervailable benefits that respondents obtained from natural gas purchases; (2) Commerce's selection of benchmark prices used to calculate countervailable benefits that respondents obtained from lignite coal purchases; (3) Commerce's refusal to exceed the largest deduction possible in applying adverse facts available to Icdas' use of an export revenue tax deduction program; and (4) Commerce's refusal to initiate an investigation on RTAC's new subsidy allegation relating to respondents' sales of electricity from the Turkish government.[2] For the reasons set forth below, the court sustains the <u>Final Determination</u> for each of these issues challenged by RTAC.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006); <u>see also</u> <u>Universal</u>

---

[2] The court addresses RTAC's separate argument about Commerce's refusal to consider certain documents in support of RTAC's subsidy allegation in a separate decision.

Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2017). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2017).

## II. Discussion

### A. Natural Gas Benchmark

RTAC challenges Commerce's selection of benchmark prices for natural gas purchases used to calculate the program benefit received by Turkish rebar producers who received countervailable subsidies by purchasing natural gas from a Turkish state-owned entity for less than adequate remuneration ("LTAR"). Once Commerce determined that the market for natural gas in Turkey was distorted, 19 C.F.R § 351.511(a)(2)(ii) directs

Commerce to select a world market benchmark to measure the benefit received from the provision of natural gas for LTAR pursuant to section 19 U.S.C. § 1677(5)(E)(iv). Specifically, 19 C.F.R § 351.511(a)(2)(ii) states

> If there is no useable market-determined price with which to make the comparison under paragraph (a)(2)(i) of this section, the Secretary will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Where there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, making due allowance for factors affecting comparability.

19 C.F.R § 351.511(a)(2)(ii). To enable Commerce to calculate the benefit received from purchasing natural gas from a state-owned entity, RTAC submitted "a set of 'border' monthly prices for natural gas sales between various European countries, sourced from Global Trade Information Services (GTIS)." Decision Memorandum at 11. RTAC also placed on the record "monthly prices for natural gas sales from Russia to Germany, sourced from the International Monetary Fund (IMF)," and in addition "derived quarterly natural gas prices charged by Gasprom, a large Russian gas company, using data from the company's financial statements." Id. The IMF dataset contained no value and quantity information and unlike the GTIS data could not be weight-averaged. Id.

In the preliminary determination Commerce first weight-averaged the GTIS data for a set of monthly benchmark prices, and then proceeded to simple average those prices with the IMF data. Id. Commerce rethought this approach in the final determination. Commerce determined that inclusion of the IMF data and the use of simple averaging skewed the pricing results by failing to account for the differences between minor gas

supplier countries and dominant gas supplier countries. Id. at 12. Accordingly, Commerce weight-averaged the GTIS data and excluded the "unweightable" IMF data. Id. Commerce further explained that the limited IMF pricing data closely tracked the larger corresponding GTIS data. Id. Commerce also distinguished past administrative proceedings cited by RTAC in which Commerce used simple averaging of pricing data, noting that in these prior cases Commerce lacked sufficient data reported in a uniform manner with adequate information to engage in weight-averaging. Id.

Despite this facially reasonable application of the benchmark regulation, RTAC nevertheless contends that Commerce erred by not utilizing simple averaging instead of weighted-averaging, and further erred by not including the IMF data in its analysis. RTAC's Br. 31-36. This is an admittedly steep hill for RTAC to climb. After all, Commerce averaged "more than one commercially available world market price" without introducing the distortions that naturally result from using a simple average. 19 C.F.R § 351.511(a)(2)(ii); see also RZBC Group Shareholding Co. v. United States, 39 CIT ___, 100 F. Supp. 3d 1288, 1308-11 (2015) (holding that calculating a benchmark derived from a weighted-average methodology, if possible, is preferable to one using a simple average methodology); id. at 1309 (noting that "Commerce now prefers to use weighted averages when the parties report price and quantity in a uniform manner." (citing Certain Oil Country Tubular Goods from the Republic of Turkey, 79 Fed. Reg. 41964 (Dep't of Commerce July 18, 2014) (final affirm. determination), and accompanying issues and decision memorandum at cmt. 4 ("Using weighted-average prices where possible reduces the potential distortionary effect of any specific transaction (e.g., extremely small

transactions) in the data.")))). RTAC fails to demonstrate that Commerce acted unreasonably in determining that weighted averaging, rather than simple averaging, was the superior method for minimizing price distortions in establishing a natural gas benchmark on the available data.

RTAC further argues that Commerce did not "grapple with the question of robustness." RTAC's Br. 36. This is incorrect. Commerce expressly found that its ability to "derive a robust natural gas benchmark" did not hinge on the IMF data because the GTIS data held "hundreds of data points, [and was] 'weightable,' whereas the single row of IMF pricing data for sales from Russia to Germany [was] not." Decision Memorandum at 12. And because the GTIS dataset contained Russian gas prices that closely tracked those in the IMF dataset, Commerce's concerns about the distorting effect of using a simple average outweighed RTAC's concerns about robustness. Id.

RTAC also speculates that because of possible "volume discounts" and alleged non-market considerations, there are problems in claiming that large suppliers reflect the market rate, while using a simple average represents a "midpoint of various values based on different volumes and distances." RTAC's Br. 33-34. RTAC, however, never made this argument to Commerce. In its administrative case briefing RTAC objected to Commerce's preliminary determination to use what it referred to as "an unprecedented 'weighted/simple average' hybrid methodology to calculate the benchmark[,]" see Non-Confidential App. to RTAC's Br. in Support of its R. 56.2 Mot. for J. on the Agency R. 266 (RTAC's Case Brief July 29, 2014), ECF. No. 55 ("RTAC's Br. App."). RTAC did not argue, as it does now, the existence of "volume discounts" in the underlying investigation, nor

claim that such discounts, should they exist, reflected non-market prices or were based on non-market principles. RTAC has therefore failed to exhaust its administrative remedies with respect to that particular aspect of its argument.

When reviewing Commerce's antidumping determinations, the U.S. Court of International Trade is mandated by statute to require exhaustion of administrative remedies "where appropriate." 28 U.S.C. § 2637(d); Boomerang Tube LLC v. United States, 856 F.3d 908 (Fed. Cir. 2017). RTAC had an opportunity to present these arguments to Commerce in the first instance and chose not to do so.  The court therefore will not consider them.

Commerce's calculation of a benchmark for natural gas derived from a weighted-average of natural gas prices in the GTIS dataset is reasonable and therefore sustained.

### B. Lignite Benchmark

In its preliminary determination, Commerce determined that Icdas benefited from subsidies from the Government of Turkey in the form of reduced coal prices in its purchases of coal from Turkish Coal Enterprises ("TKI"), a state-owned entity. Decision Memorandum at 13-16. Applying 19 C.F.R § 351.511, Commerce preliminarily determined that the market prices of Icdas' imports of steam coal could properly be used as a tier one benchmark against which to evaluate the benefit Icdas received in purchasing coal from TKI. However, upon subsequent challenge by RTAC and further factual investigation, Commerce determined that Icdas only purchased lignite coal from TKI and that lignite coal was distinguishable from other hard steam coal that Icdas imported. Accordingly, in its final determination, Commerce excluded pricing data relating

to non-lignite coal, and after determining that the Turkish lignite market was too influenced by the Government of Turkey to provide reliable market-set benchmark prices, Commerce decided to use only "world market prices for lignite itself; specifically . . . GTIS pricing data on the record submitted by Petitioner." Id. at 15-16. Commerce explained that because lignite coal was the only coal provided by the Turkish Government, the subsidy investigation scope was properly narrowed to data just involving lignite coal. Further, as Commerce found that the domestic lignite market was distorted by government interference, it was necessary to use "tier two" pricing data from available world prices for lignite. Id. at 16.

RTAC, in its administrative case briefing, argued that hard steam coal and lignite were not interchangeable as assumed initially by Commerce, and urged Commerce to calculate a lignite benchmark from a simple averaging of world market pricing data. RTAC's Br. 36-37. Although Commerce ultimately adopted the position that lignite and hard steam coal were not interchangeable, and that the subsidy investigation should be limited to lignite coal, Commerce rejected RTAC's suggestion of benchmark calculations using a simple average of world prices in favor of using a weighted average of lignite world pricing data. Decision Memorandum at 16-17. There were two sets of lignite world pricing data on the record: GTIS and IMF. As in its natural gas subsidy analysis, Commerce noted that the GTIS data provided monthly quantity and value pricing data for several countries lignite transactions and that such data was "weightable;" whereas the IMF data provided only contained monthly unit prices for sales of lignite from Australia and was not "weightable." Id. at 16. Using the same reasoning as it had applied in

evaluating the natural gas benchmark, Commerce calculated a lignite benchmark from a weighted average of the pricing data, using only the "weightable" GTIS data and excluding the IMF data. Id.

RTAC challenges Commerce's decision to use a weighted average to calculate the lignite benchmark and Commerce's corresponding decision to exclude the IMF data. RTAC's argument is essentially identical to its challenge that Commerce improperly calculated the natural gas benchmark; both arguments urge that Commerce should have used a simple average to calculate the appropriate benchmark and that Commerce should not have excluded the "unweightable" IMF data absent a finding of defects in that data. See RTAC's Br. 37 (explaining that "DOC's benchmarking calculations with respect to lignite purchased by respondents from the Turkish government are flawed for the same reasons as the benchmarking calculations for natural gas.").

Here again, as with the natural gas benchmarks, Commerce acted reasonably in deciding that weight-averaging is preferable to simple averaging in calculating benchmarks upon available world market pricing data. See Section II.A, supra (Commerce's determination that the distortion-minimizing benefits of weight-averaging outweigh the benefits provided by simple averaging was reasonable). The court therefore sustains Commerce's weight-averaging of the GTIS data to determine the lignite benchmark.

### C. Export Revenue Tax

Commerce determined, contrary to Icdas' representation, that Icdas had in fact used the Turkish "Deductions for Taxable Income for Export Revenue" program to reduce

its taxable income in 2011. <u>Decision Memorandum</u> at 19. As a result Commerce used an

adverse inference in evaluating the benefit Icdas received under the program. <u>Id.</u>

Commerce explained that the program is well known to Commerce, that Commerce has

examined, verified, and countervailed it in numerous Turkey countervailing duty cases.

Commerce also explained that the program has two built-in limitations: (1) the amount of

the deduction for undocumented expenses cannot exceed 0.5 percent of export revenue

and (2) there is a cap to the amount of benefit that a company can receive under the

program. Commerce therefore maintains a practice of applying, as adverse facts

available ("AFA"), the largest deduction possible under the program. <u>Id.</u> (citing <u>Circular</u>

<u>Welded Carbon Steel Pipes and Tubes from Turkey</u>, 78 Fed. Reg. 64,916 (Dep't  of

Commerce Oct. 30, 2013) (countervailing duty admin. rev.)). Consistent with this practice,

Commerce determined the largest deduction possible for Icdas under the program, and

then derived a net countervailable subsidy rate of 0.10 percent <u>ad valorem</u> for Icdas. <u>Id.</u>

RTAC challenges Commerce's selection of this rate, arguing that Commerce's

decision was inconsistent with a more general prior practice of eschewing <u>de minimis</u>

rates, and that the rate applied is apparently insufficient to induce interested parties to

participate in the proceedings, thus frustrating the purpose of assigning an AFA rate.

RTAC's Br. 38-42. RTAC argues that Commerce should have instead contrived an

adverse rate greater than the maximum benefit that Icdas could possibly receive under

the Turkish program.

Commerce reasonably rejected RTAC's arguments. Commerce explained that it

acted in accordance with its prior practice for this specific program, applying the largest

deduction possible, which was known and calculable. <u>Decision Memorandum</u> at 19. RTAC identifies no express statutory command requiring Commerce to inflate a remedial countervailing duty rate beyond the known, calculable, maximum benefit under this particular Turkish program. It also strikes the court as an overreach to seek additional duties for a benefit that has been fully countervailed, (wholly satisfying the statute's primary purpose of leveling the playing field, <u>see generally</u> 158 Cong. Rec. H1166, H1166–73 (Mar. 6, 2012), and lessening the import of whatever subordinate purpose inheres in the adverse inference provision). The court therefore sustains Commerce's decision.

### D. Rejected New Subsidy Allegation

RTAC contends that Commerce should have initiated an investigation for alleged electricity subsidies.[3] In support of its allegation, RTAC argued that the Turkish government allegedly paid power producers more than adequate remuneration for the sale of electricity. <u>See</u> RTAC's Br. App. 241 (Memorandum from Kristen Johnson, Int'l Trade Compliance Analyst, to Melissa G. Skinner, Director, re: Countervailing Duty (CVD) Investigation on Steel Concrete Reinforcing Bar from Turkey: Decision Memorandum on Additional Subsidy Allegation Nov. 25, 2013). Commerce reviewed RTAC's argument and information and determined that although RTAC's submissions indicated that Independent Power Producers ("IPPs") benefitted from the Turkish government guarantees and electricity purchase prices above market rates, that same evidence

---

[3] The court is addressing separately RTAC's argument about Commerce's rejection of certain documents in support of RTAC's subsidy allegation.

distinguished IPPs from autoproducers (like respondents) and did not directly indicate that autoproducers sold surplus electricity to the government at higher than market rates. RTAC argues that Commerce unreasonably concluded from the administrative record that IPPs were distinct and separate from the autoproducers subject to RTAC's subsidy allegation. RTAC's Br. 28.

RTAC's proffered information that IPPs were offered "above-market prices" and guarantees from the Government of Turkey, and wanted Commerce to infer that those same benefits accrued to Turkish autoproducers. Commerce though did not draw that inference, instead noting that RTAC's own submissions "consistently distinguish[ed] IPPs from autoproducers." RTAC's Br. App. 241-42. Commerce expressly noted that "[p]etitioner provided no information indicating that rebar autoproducers also operate as IPPs." Id. at 242.

All RTAC offers is its own inference about the absence of direct evidence. That alone though is insufficient to undermine the reasonableness of Commerce's equally reasonable inference from the available record evidence. Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Technical, Salaried & Mach. Workers, AFL–CIO, 6 F.3d 1511, 1520 (Fed. Cir. 1993) ("The question is whether the record adequately supports the decision of [Commerce], not whether some other inference could reasonably have been drawn."). The court therefore sustains this aspect of the Final Determination.

### III. Conclusion

For the foregoing reasons, the court sustains Commerce's <u>Final Determination</u>.


                                          _____/s/ Leo M. Gordon_____
                                            Judge Leo M. Gordon


Dated:     November 17, 2017
           New York, New York